**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael S. MENZER, Defendant–
Appellant.**

No. 93–2594.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1994.

Decided July 21, 1994.

Stephen J. Liccione, Asst. U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

Franklyn M. Gimbel (argued), Kathryn A. Keppel, Raymond M. Dall'osto, Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for defendant-appellant.

Before BAUER, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

A federal grand jury sitting in Milwaukee, Wisconsin, returned a one-count indictment against the defendant charging him with arson resulting in the death of his two children. A jury returned a guilty verdict and the defendant was sentenced to forty years imprisonment to be followed by five years of supervised release. Menzer was also fined $10,000 and ordered to pay a $50 special assessment. We affirm.

## BACKGROUND

In the early 1980's, Michael Menzer purchased an old mill and granary in Waldo, Wisconsin in which he opened the Onion River Mill and Art Gallery. At this time, Menzer became acquainted with Grace Durfee, who had a son named Tyrone from a previous relationship. In May 1983, Grace gave birth to a second son, Jason, fathered by Menzer and thereafter the couple married in December 1983. Grace gave birth to a third son, Kyle, after the marriage. The family lived on the third floor of the Onion River Mill and Menzer operated his art gallery and souvenir shop on the first and second floors of the mill.

In 1988, Grace and Michael's marriage began deteriorating and Menzer filed for divorce in 1989. Prior to the final divorce proceedings, Grace threatened to report Menzer for his recent sexual abuse of the three boys. Menzer feared that if this information became known to law enforcement authorities it might result in the revocation of his probation for a prior sexual exploitation charge (of other children) to which he pleaded no contest and was convicted in 1986.

On September 13, 1990, the Sheboygan County Circuit Court entered the final decree terminating the marriage and providing for division of the property. The defendant received the mill and art gallery in the settlement encumbered with $90,000 in debt, while Grace obtained exclusive custody of the children. Grace and the boys remained in their residence above the mill for three days after the divorce was finalized while the defendant resided in his mother's home. On September 15, 1990, Grace and Menzer had an argument in which she again threatened to report his recent sexual abuse of her sons to the police. On the night of September 16, Grace and the boys were sleeping in the upstairs residence when a fire broke out in the Onion River Mill. Grace escaped with her youngest son Kyle but the two older boys died of smoke inhalation. Menzer, who was sleeping at his mother's home, was notified of the fire by sheriff's deputies and taken to the scene. He informed the deputies that in July, 1990, he had reported an alleged arson attempt at the Onion River Mill. At that time, Menzer told a sheriff's deputy that he had found a charred, rolled up newspaper under a wooden door on the north end of his building that burned a portion of the building.

One month later, in October 1990, following an investigation by Sheboygan law enforcement authorities, Menzer was arrested for the sexual exploitation of his three boys; his probation (from the 1986 conviction) was revoked and he was imprisoned. Menzer was charged, tried and acquitted by a jury of the new charges of abusing the three boys but remained imprisoned under the probation revocation resulting from the 1986 conviction. While in prison he confided in a fellow inmate, David Knoblock, that he had set fire to the Onion River Mill. Based on a tip from Knoblock, federal agents investigated Menzer regarding the arson while he was incarcerated at the Oshkosh Correctional Institution. Menzer voluntarily met with the agents regarding the arson without counsel present. Based on the evidence obtained in the investigation, including Knoblock's tip, and statements made to the federal agents, the federal grand jury indicted Menzer on

January 28, 1992 for the arson of the Onion River Mill. A trial was commenced on April 20, 1992 but the trial judge granted the defendant's motion for a mistrial on April 21 because the government made reference to his probation revocation contravening the court's pre-trial ruling.[1] After discharging the jury, the judge commented to counsel that the government "ha[d] a period of time within which to determine whether they are going to proceed or not." The judge also stated that he would "await the developments in the future." Shortly after the granting of the mistrial, the government, on May 8, filed a motion for clarification of the evidentiary rulings regarding the admissibility of certain statements made by Menzer as well as the probation revocation. The trial court denied the government's motion on May 12. The government filed a second motion for clarification on June 16 which the court denied on June 25. On June 30, 1992, the government filed a motion to dismiss the indictment without prejudice which the court granted on July 28. Menzer was reindicted on December 1, 1992 and made his initial appearance before the magistrate on December 11. On December 14, defense counsel entered a motion to dismiss the arson charge based on the Speedy Trial Act, 18 U.S.C. § 3161, which the court denied on December 17. Aware of the fact that perhaps only fifteen days of nonexcludable time remained in which to try the defendant,[2] the court said it was willing to hold the trial within two weeks, but defense counsel declined to accept this option. Accordingly, the court granted both counsel time to file pre-trial motions which were resolved on February 8, 1993 and the trial commenced on February 16, 1993.

## ISSUES

Menzer raises five separate challenges to his conviction and/or sentence: (1) whether

his rights under the Speedy Trial Act, 18 U.S.C. § 3161, were violated; (2) whether the federal government had a federal interest in prosecuting the arson of the Onion River Mill; (3) whether statements taken from Menzer while he was in prison violated his constitutional rights; (4) whether the trial judge abused his discretion in admitting evidence of Menzer's prior sexual abuse conviction; and (5) whether the sentencing court's upward departure from the Sentencing Guidelines was proper.

## DISCUSSION

### Speedy Trial Act

"The Speedy Trial Act, 18 U.S.C. § 3161 et seq. (1982), was a legislative response to a perceived failure in the court system to adequately insure that 'in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial ...'" *United States v. Montoya,* 827 F.2d 143, 147 (7th Cir.1987) (quoting U.S. Constitution Amendment VI). Under the Act,

> "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."

18 U.S.C. § 3161(c)(1). However, the Act allows for the trial court to exclude time from the seventy-day period for various enumerated purposes including "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing

1. Prior to trial, the judge ruled that the government could not introduce evidence of Menzer's prior convictions but could establish that he was on probation at the time of the arson. The court did not rule on whether the government could mention the fact that Menzer's probation was revoked following the arson. Following Menzer's reindictment on December 1, 1992, the case was assigned to a different trial judge. All proceedings prior to the dismissal of the original indictment on July 28, 1992 were before the original trial judge. We will refer to the judge in the first trial as "the first judge" or the "original judge" and the judge in the second trial as the "second judge."

2. Judge Evans ruled that upon reindictment, the government had a new 70 days to try the defendant. The Assistant U.S. Attorney, however, believed that the Speedy Trial clock may not have restarted upon reindictment leaving only 16 days in which to hold a trial.

on, or other prompt disposition of, such motion." *See* 18 U.S.C. § 3161(h)(1)(F).

■ The speedy trial problem in the case before us arose after the trial court granted a mistrial on April 21, 1992. Section 3161(e) provides that if "the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." In this case, there is no dispute that following the mistrial on April 21, the government had seventy days in which to retry the defendant. The dispute involves the question of whether the government was entitled to a new seventy-day time period commencing on July 26, 1992, following the dismissal of the initial indictment without prejudice. The government subsequently reindicted the defendant on December 1, 1992 and the case was reassigned to a judge other than the one who presided over the original trial. *See supra* note 1. In a December 17 hearing before the new trial judge, the judge ruled that the government received a "fresh clock" after reindicting the defendant. Menzer argues that the trial court erred in ruling that the government obtained a "fresh clock" upon the December 1, 1992 reindictment. The defendant also argues that the court erred in determining that *if* there was not a fresh clock, that the government's two motions following the mistrial failed to exclude time under 18 U.S.C. § 3161(h)(1)(F). We review the trial court's interpretation of the Speedy Trial Act *de novo*. *Montoya,* 827 F.2d at 146.

The only section of the Act relating to reindictment of a defendant appears in § 3161(h)(6) which provides:

"[i]f the information or indictment is dismissed upon motion of the attorney for the government and thereafter a charge is filed against the defendant for the same offense, or any offense required to be joined with that offense, any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous charge."

Although our circuit has not directly faced the question of whether a defendant receives a fresh clock upon reindictment, a number of other Circuit Courts have held that the government does not obtain a fresh clock when the dismissal of the original indictment was upon the government's motion; rather, the time is tolled from the dismissal of the first indictment until the reindictment. The Eighth Circuit construed § 3161(h)(6) in *United States v. Leone,* 823 F.2d 246, 248 (8th Cir.1987), and held that "where an indictment is dismissed on the government's motion and a defendant is later reindicted, the seventy-day period continues to run from the first indictment." The court stated "[w]e find crucial in this section the words: 'had there been no previous charge.' We therefore read this section as stating that for purposes of restarting the seventy-day clock, the second charge is treated as an original charge." *Id. See also United States v. Rubin,* 733 F.2d 837, 840 (11th Cir.1984) ("When an indictment is dismissed on the motion of the defendant, or for reasons other than the motion or request of the government, the seventy-day time period begins to run anew...."); *United States v. Rodriguez–Restrepo,* 680 F.2d 920, 921 (2d Cir. 1982) (holding that when the initial indictment is dismissed, the "time between the dismissal and the later reindictment or first appearance on the subsequent indictment is not included in the computations pursuant to the Act" but the nonexcludable time under the first indictment is included). In perhaps the clearest statement regarding the calculation of time under § 3161, the Ninth Circuit stated:

"Section 3161(d) provides that when an indictment is dismissed on the *defendant's* motion, the subsequent return of a new indictment triggers a new seventy-day time period. *See [United States v. Karsseboom,* 881 F.2d 604, 606 (9th Cir.1989) ]; *United States v. Harris,* 724 F.2d 1452, 1454 (9th Cir.1984); *United States v. McCown,* 711 F.2d 1441, 1446 (9th Cir. 1983). The seventy-day clock also starts anew if the district court dismissed the first indictment *sua sponte. See United States v. Feldman,* 788 F.2d 544, 549 (9th

Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

However, if the first indictment is dismissed on the *government's* motion, the statute time limit is merely suspended until a new indictment is returned; the seventy-day clock is not reset. *See* 18 U.S.C. § 3161(h)(6); *Feldman,* 788 F.2d at 548, *McCown,* 711 F.2d at 1446."

*United States v. Magana–Olvera,* 917 F.2d 401, 404–05 (9th Cir.1990). *See also United States v. Roman,* 822 F.2d 261, 264 (2d Cir. 1987), *cert. denied,* 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987) ("[t]he Act provides that the speedy trial clock is tolled during the period of time after dismissal, when no charges are pending, and on the new indictment the clock resumes from the point at which it stopped when the original indictment was dismissed"); *United States v. Perez,* 845 F.2d 100, 103–04 (5th Cir.1988), *cert. denied sub nom., Aranda–Rodriguez v. United States,* 488 U.S. 847, 109 S.Ct. 124, 102 L.Ed.2d 98 (1988) ("Under § 3161(h)(6), when an indictment is dismissed on the Government's motion, the statutory time limit is merely suspended until a new indictment is returned. The period between the indictments is excluded from speedy trial calculations, but the clock is not reset.").[3]

■ In *United States v. Horton,* 676 F.2d 1165, 1170 (7th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983), this court had an opportunity to comment on subsection 3161(h)(6) and stated:

"subsection 3161(h)(6) controls a situation where there is an interval between the time the original indictment is dismissed on the government's motion and the superseding indictment is returned. In that situation, the time limitation is tolled during the period when no indictment is outstanding.

\* \* \* \* \* \*

There was no time gap between the two indictments returned in this case. Nevertheless, a fair implication of the statute is that reindictment for the same offense is permissible and that the time period begins to run with the first indictment."

*Id.* (citations omitted).[4] It is obvious from the decisions of the Second, Fifth, Eighth, Ninth and Eleventh Circuits that the trial judge was incorrect in stating that the clock restarted upon reindictment. This does not mean, however, that the defendant's speedy trial rights were violated because the defendant is still required to demonstrate that seventy nonexcludable days elapsed prior to February 16, 1993 when the new trial commenced.

■ The defendant's second argument under the Speedy Trial Act is that the government's motions following the mistrial failed to exclude time under § 3161(h)(1)(F). If the government's two motions did exclude the time in question, then there was no Speedy Trial Act violation. The defendant's argument is that the government's May 8, 1992 and June 16, 1992 motions were *post-*

---

**3.** In *United States v. Roy,* 791 F.Supp. 179, 180–181 (S.D.Ohio 1991), *aff'd,* 955 F.2d 45 (6th Cir.1992), the district court stated "[a]lthough it appears the Sixth Circuit has not ruled upon this issue, we agree with those circuit courts that have interpreted this provision tolling the speedy trial time between the dismissal of the original indictment by the government and the filing of the subsequent indictment as necessarily implying that the includable time with regard to the original indictment should be added to the includable time with regard to the subsequent indictment in calculating the speedy trial time period."

**4.** *See also United States v. Rojas–Contreras,* 474 U.S. 231, 239, 106 S.Ct. 555, 558–59, 88 L.Ed.2d 537 (1985), in which Justice Blackmun stated in concurrence,

Because the criminal process does not always proceed in a linear fashion, the Act addresses

second indictments that occur, unlike in this case, following dismissal of the first indictment. When an indictment is dismissed on the motion of the defendant, and the defendant is thereafter reindicted, both the 30–day and 70–day periods run anew. See 18 U.S.C. § 3161(d)(1). In contrast, however, when an indictment is dismissed on motion of the Government, and the defendant is thereafter reindicted, both the 30–day and 70–day periods continue to run from the first indictment, with the proviso that the period during which no indictment is outstanding is excluded from the 70–day calculation. See 18 U.S.C. § 3161(h)(6). The difference in treatment protects against governmental circumvention of the speedy-trial guarantee.

*Id.* (Blackmun, J., concurring).

*trial* motions and not *pre-trial* motions and the statute only allows excludable time for "any pre-trial motion." This argument is without merit for the granting of the mistrial necessitated either a new trial or dismissal of the charges. The government's purpose in filing the motions was to determine the admissibility of evidence in a new trial, thus the motions filed following the mistrial were pre-trial motions preceding the impending second trial. *See Henderson v. United States,* 476 U.S. 321, 331, 106 S.Ct. 1871, 1877, 90 L.Ed.2d 299 (1986) ("[t]he provisions of the [Speedy Trial] Act are designed to exclude all time that is consumed in placing the trial court in a position to dispose of a motion"); *United States v. Rojo–Alvarez,* 944 F.2d 959, 966 (1st Cir.1991) ("when the court is presented with papers *styled* as a motion, whether it ultimately determines that the filing is a pretrial motion or an 'other proceeding' under [§ 3161(h)(1)(J) ], the court is entitled to exclude at least the period of time during which it considers how to treat the filing"). Accordingly, for purposes of the Speedy Trial Act, the five days to resolve the first pretrial motion (May 8–12, 1992) and ten days to resolve the second pretrial motion (June 16–25, 1992) were excludable.[5]

■ Therefore, when Menzer made his initial appearance before the new judge on December 11 following the reindictment (on December 1, 1992), there were sixteen days left under the Speedy Trial Act (15 days of excludable time due to the May 8 and June 16 motions and 1 day of the original 70 days provided in the Act). Two days elapsed on the 12th and 13th of December but on the 14th the clock stopped when the defendant filed a motion to dismiss which was resolved by the trial judge on the 17th of December. At the December 17, 1992 hearing, although

the trial court ruled the government had a fresh clock, the judge expressed his willingness to hold the trial within two weeks in case the clock had not restarted upon reindictment. Defense counsel declined to accept this option stating that he desired to file several motions and he had briefs in unrelated cases to file. The trial court gave counsel until December 28, 1992 to file its pre-trial motions. This time (December 17–28) is clearly excludable. *Montoya,* 827 F.2d at 153 ("Time consumed in the preparation of a pre-trial motion must be excluded—provided that the judge has expressly granted a party time for that purpose.") (quoting *United States v. Tibboel,* 753 F.2d 608, 610 (7th Cir.1985)). Moreover, the time from December 28 until February 8, 1993 when the court resolved the pre-trial motions was excludable under § 3161(h)(1)(F) and § 3161(h)(8).[6] Thus, as of February 8, 1993, fifty-six of the allotted seventy days had elapsed. Eight days of non-excludable time accrued between February 9 and February 16 but six days still remained under the Speedy Trial Act when the trial commenced on February 16. Thus, based on these calculations, there was no violation of the Speedy Trial Act.

## 18 U.S.C. § 844(i): Federal Jurisdiction over Arson

■ The defendant argues that the district court lacked jurisdiction over this arson prosecution because the arson of a private home had no impact on interstate commerce and thus there was no federal interest. We disagree because the structure in question was not merely a private residence and even if it was a private residence, the court would still have jurisdiction.

---

**5.** The defendant claims that if the government's motions serve to exclude time under the Speedy Trial Act, it will "thwart[ ] congressional intent that the Act expedite trials in the criminal justice system. Adopting the government's argument would be tantamount to sanctioning the manipulation of the system." We disagree, for the trial court is in the best position to determine whether the government has "manipulated" the system and if it so finds, it may dismiss the indictment with prejudice. *See* 18 U.S.C. § 3162(a)(1) (instructing the court to consider "the facts and circumstances of the case which led to the dis-

missal" when deciding between dismissal *with* prejudice and dismissal *without* prejudice).

**6.** At the December 17, 1992 hearing, the second judge offered counsel the choice of trying the case within two weeks, on January 26, 1993 or February 16, 1993 and defense counsel expressed his preference for February 16. The Judge then entered an order excluding the time from December 17, 1992 until trial on February 16, 1993 under § 3161(h)(8).

In 1970, Congress passed Title XI of the Organized Crime Control Act of 1970 which included 18 U.S.C. § 844(i). Section 844(i) states

"Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000.00, or both."

"Congress has the power to enact a criminal statute pursuant to the commerce clause as long as the statute controls acts which have, at least, a *de minimis* effect on interstate commerce." *United States v. Stillwell*, 900 F.2d 1104, 1110 (7th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990). In *Stillwell*, we upheld the federal court jurisdiction over an arson conviction stemming from the arson of a private home because

"[i]n light of the Court's expansive view of Congress' power to legislate under the commerce clause, we think Congress could rationally believe that, in the aggregate, arson of private residences supplied with interstate natural gas has more than a *de minimis* effect on interstate commerce.

\* \* \* \* \* \*

Congress intended § 844(i) to cover any building it constitutionally has the power to reach. Since Congress could reasonably believe that arson of private homes receiving interstate natural gas has more than a *de minimis* effect on interstate commerce, the application of § 844(i) to defendants in this case is not an unconstitutional exercise of power...."

*Id.* at 1111–12.

Our holding in *Stillwell* clearly states the broad scope of § 844(i) and thus if the government presented evidence in this case that Menzer's Onion River Mill received natural gas transported in interstate commerce or that the building had more than a *de minimis* effect on interstate commerce, then prosecution under § 844(i) was proper. At trial, the government presented evidence that the first two floors of the building served as Menzer's art gallery and souvenir business under the name the Onion River Mill and Art Gallery. Menzer stipulated at trial to the fact that he purchased items for resale that traveled in interstate commerce and he served customers from outside the State of Wisconsin. Moreover, natural gas that traveled in interstate commerce was supplied by Wisconsin Gas Company to heat all three floors of the building (the residence, the art gallery and the souvenir shop). Based on this evidence, prosecution under § 844(i) was proper because the building had more than a *de minimis* effect on interstate commerce. *Stillwell*, 900 F.2d at 1110–12.

### Suppression of Menzer's Statements Taken while in Prison

■ Menzer argues that his constitutional rights (set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) were violated when law enforcement officers interrogated him while he was in prison and that the statements made while imprisoned should have been suppressed. There is a disagreement between the parties as to the appropriate standard of review when determining whether a custodial interrogation occurred. As we acknowledged in *United States v. Lennick*, 917 F.2d 974, 976–77 (7th Cir.1990), courts in other federal circuits have applied conflicting standards of review ranging from a clearly erroneous review to *de novo* review. *Id.* at 977. Because the defendant does not challenge the facts but merely the legal determination of the lower court, *de novo* review is appropriate.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the U.S. Supreme Court held that

"the prosecution may not use statements, ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

In *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the defendant was incarcerated in state prison when Internal Revenue agents sought to question him on matters relating to a "routine tax investigation." *Id.* at 4, 88 S.Ct. at 1504. When a subsequent criminal action was initiated against the defendant for tax fraud, the defendant sought to have the statements made to the IRS agents suppressed and cited *Miranda.* The district court and court of appeals denied the motion to suppress. The Supreme Court granted certiorari to determine whether *Miranda* applied when the defendant "had not been put in jail by the officers questioning him, but was there for an entirely separate offense." *Id.* The Court stated

> "The Government also seeks to narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is "in custody" in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody."

*Id.* at 4–5, 88 S.Ct. at 1505. Thus in *Mathis,* the question presented to the court was whether government agents could interrogate a prisoner without giving *Miranda* warnings regarding an offense separate and distinct from the offense for which he was incarcerated. The Court did not expressly address the question of whether imprisonment *per se* constitutes being "in custody" for purposes of *Miranda.* The Second, Fourth, Eighth and Ninth Circuits have held that, when challenging a statement given by a defendant, merely because the defendant is in prison on an unrelated charge does not mean the defendant is "in custody" under *Miranda. See United States v. Willoughby,* 860 F.2d 15, 23 (2d Cir.1988) ("we believe that the mere fact of imprisonment does not mean that all of a prisoner's conversations are official interrogations that must be pre-

ceded by *Miranda* warnings"), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989); *Leviston v. Black,* 843 F.2d 302, 303 (8th Cir.) ("[w]hile *Miranda* may apply to one who is in custody for an offense unrelated to the interrogation, [*Mathis,* 391 U.S. at 4–5, 88 S.Ct. at 1504–55], incarceration does not *ipso facto* render an interrogation custodial"), *cert. denied,* 488 U.S. 865, 109 S.Ct. 168, 102 L.Ed.2d 138 (1988); *United States v. Conley,* 779 F.2d 970, 972 (4th Cir.1985) ("declin[ing] to read *Mathis* as compelling the use of *Miranda* warnings prior to all prisoner interrogations and [holding] that a prison inmate is not automatically always in 'custody' within the meaning of *Miranda* "), *cert. denied,* 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986). *Cervantes v. Walker,* 589 F.2d 424 (9th Cir.1978), involved a case in which a sheriff's deputy found a matchbox containing a substance resembling marijuana during a routine search of an inmate's belongings. Upon discovery, the deputy inquired of the inmate what was in the matchbox. The Ninth Circuit ruled that even though the defendant was incarcerated, the interrogation was noncustodial and clearly enunciated the reasons against a *per se* rule that imprisonment alone is sufficient to invoke *Miranda* protections:

> "To interpret *Mathis* as [the defendant] urges would, in effect, create a per se rule that any investigatory questioning inside a prison requires *Miranda* warnings. Such a rule could totally disrupt prison administration. *Miranda* certainly does not dictate such a consequence....
>
> Adoption of [the defendant's] contention would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart. We cannot believe the Supreme Court intended such a result. Thus, while *Mathis* may have narrowed the range of possible situations in which on-the-scene questioning may take place in a prison, we find in *Mathis* no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prisoner status."

*Id.* at 427.[7]

■ In each of the cases cited above, the courts examined "the totality of the circumstances" to determine whether the inmate was "in custody" as set forth in *Miranda.* Factors the courts considered in determining whether the prisoner was "in custody" include: the defendant's " 'freedom to leave the scene and the purpose, place and length' of the questioning," *Leviston,* 843 F.2d at 304; "a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement," *Conley,* 779 F.2d at 973; and whether "circumstances ... suggest[ ] any measure of compulsion above and beyond [the] confinement," *Willoughby,* 860 F.2d at 24.[8]

■ We now turn to the facts in the particular case before us to determine if a custodial interrogation occurred. Prior to the first trial, the U.S. Magistrate Judge held a hearing on the defendant's motion to suppress and heard the testimony of the one of the agents who performed the interrogation of the defendant Menzer (Special Agent Gregory J. Eggum) as well as the testimony of the prison registrar Lawrence R. Stahowiak. Following the hearing the magistrate judge issued his recommendation to the trial judge that the statement not be suppressed because Menzer was not "in custody" for purposes of *Miranda.* The defendant does not challenge the factual findings but rather the legal conclusions reached by the lower court which adopted the magistrate judge's recommendations. The defendant argues that because he was incarcerated he was not free to leave the interrogation and thus he was "in custody" under *Miranda.* While it is undisputed that the defendant was incarcerated for an unrelated crime, we conclude that Menzer was not "in custody" for the purposes of *Miranda* because there was no "added imposition on his freedom of move-

ment" nor "any measure of compulsion above and beyond [imprisonment]". The defendant was advised an officer was coming to talk with him, the defendant voluntarily appeared at the interviews, he was not restrained in any manner, the room was well lit, there were two windows exposing the interview room to the prison administrative office area, the door to the interview room was unlocked and the defendant was told by Agent Eggum that he was free to leave at any time.[9] The magistrate judge specifically found that the agents told Menzer that "he was free to take a break, leave, or terminate the interview at his discretion." Moreover, based on the testimony of the prison registrar, the magistrate judge found that at the Oshkosh Correctional Institution "[i]t is generally understood throughout the prison that participation in any such meetings [with law enforcement officers] is voluntary and inmates need not attend." Finally, before the last interview, on June 28, 1991, Agent Eggum faxed ten written questions to the registrar and requested that the questions be forwarded to Menzer. Eggum did this so Menzer would know what to expect in advance and thus be free to decide whether he wanted to meet with the agents. Based on the foregoing, we are in agreement with the trial court's denial of the motion to suppress because despite the defendant's incarceration, there was no "added imposition on his freedom of movement," *Conley,* 779 F.2d at 973, nor "any measure of compulsion above and beyond [the] confinement." *Willoughby,* 860 F.2d at 24. As the Ninth Circuit stated in *Cervantes,* a holding that incarceration *per se* results in custody under *Miranda* would result in "the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Cervantes,* 589 F.2d at 427. Thus we hold that upon examining the totality of the circumstances, the

---

7. The U.S. Supreme Court has declined an opportunity to address the question of whether incarceration constitutes custody for purposes of *Miranda.* *See Bradley v. Ohio,* 497 U.S. 1011, 1012–13, 110 S.Ct. 3258, 3259, 111 L.Ed.2d 768 (1990) (Marshall, J. dissenting from denial of certiorari).

8. The test for whether an individual is "in custody" under *Miranda* outside the prison context,

for instance during a *Terry* stop, is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984).

9. The magistrate judge found "there was no evidence of police coercion" thus we assume the interrogating officers were unarmed.

interview by the law enforcement officers of the imprisoned defendant was not in violation of his constitutional right to be free from self-incrimination.[10]

### Admission of Prior Child Sexual Abuse Convictions

 The defendant argues that at the second trial, the judge abused his discretion in admitting evidence of Menzer's 1986 conviction for sexual exploitation of a child and the fact that Menzer was on probation for that conviction in 1990 when the arson occurred.[11] The defense claims that the evidence is inadmissible under Fed.R.Evid. 404(b) [12] because it fails to pass the four-part *Shackleford* test.[13] The government, on the other hand, argues that we need not apply the *Shackleford* test if the evidence was "intricately related to the facts of this case." *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). In *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir.1993), we held that we need not apply the *Shackleford* test when the evidence sought to be admitted is "intricately related" to the charged offense. *Id.* (quoting *United States v. Hargrove*, 929 F.2d 316, 320 (7th Cir.

1991)). Thus we agree with the government's position that if the evidence of Menzer's prior sexual exploitation conviction was in fact "intricately related" to the prosecution of the arson case, then the *Shackleford* test is inapplicable. If the government can establish the intricate relation between the prior conviction and the present arson case, then the evidence is admissible if it also passes the balancing test required by Fed.R.Evid. 403.[14] *Hilgeford*, 7 F.3d at 1345. Finally, "[w]hen reviewing a district court's decision to admit evidence, we will reverse the court's decision only when we find an error which rises to the very serious, and uncommon, level of an abuse of discretion. Abuse of discretion only occurs when no reasonable person could take the view of the trial court." *Id.*

 The government's theory of the case was that Menzer, who was on probation in 1990 for his 1986 conviction for sexual exploitation of a child, burned down the Onion River Mill where his wife and three children were sleeping to prevent her and the children from reporting that he had been sexually abusing the three children which would result in revocation of his probation. Accordingly, the government sought to admit the evidence of the 1986 conviction and the

---

10. We also note the magistrate judge found that during one of the interviews Menzer had with the law enforcement officers while he was incarcerated, Menzer commented "maybe I should speak with a lawyer." The U.S. Supreme Court has just made clear that this statement does not constitute a request for counsel. *See Davis v. United States*, —— U.S. ————, 114 S.Ct. 2350, 2357, 129 L.Ed.2d 362, (1994) (holding that suspect's statement "maybe I should talk to a lawyer" was not a request for counsel. "Unless a suspect actually requests an attorney, questioning may continue").

11. At the first trial, the trial judge, who was not the same judge who presided at the second trial, ruled the evidence was inadmissible because "child molestation is so repugnant, so repulsive, and so reprehensible and disgusting that it is very likely to inflame any reasonable person to the point of generating a bias or a prejudice where none existed before."

12. Rule 404(b) provides in relevant part:
 **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes,

such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, ...

13. In *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984), this court established a four-part test for determining whether evidence is admissible under Rule 404(b). The test is whether

 "the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, ... (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."
 *Id.*

14. Rule 403 provides:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

fact that Menzer's probation could have been revoked (for the alleged sexual misconduct with his three sons between 1986 and 1990) to establish his motive in burning down the building. The trial judge ruled that the evidence was admissible only for a limited purpose and instructed the jury accordingly: "[y]ou may consider this evidence only on issues like Mr. Menzer's motive, his intent, his knowledge and the absence of mistake. This evidence is to be considered by you only for this limited purpose." *See United States v. Torres,* 977 F.2d 321, 329 (7th Cir.1992) (holding that the admissibility of other acts "is treated with great deference because of the trial judge's first-hand exposure to the witnesses and evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding"). Upon review of the record, we hold that the trial court did not abuse its discretion in admitting the evidence of the conviction and probation because it was intricately related to the arson prosecution as probative evidence of Menzer's intent (motive). Menzer had good reason to fear that if his wife reported him to the authorities his probation would have been revoked and he would have been imprisoned for the 1986 conviction. As we have just stated, the evidence is exceedingly probative as to Menzer's motive. Rule 403, however, requires that the probative value of the evidence outweigh its unfair prejudicial effect. "[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote." *Torres,* 977 F.2d at 328. The defendant argues that the risk of unfair prejudice arises from the possibility that the jury may be biased against a previously convicted child molester. In the instant case, we are confident that any prejudice was minimal because the court did everything in its power to reduce any possibili-

ty of prejudice by instructing the jury not to consider the evidence for any other purpose than "motive, intent, knowledge and absence of mistake." *See United States v. Severson,* 3 F.3d 1005, 1015 (7th Cir.1993) ("[w]e rely on our belief that juries heed the instructions"). Accordingly we hold that the trial court did not abuse its discretion when it admitted the evidence along with an accompanying instruction limiting the jury's use of the evidence.

### Upward Departure from Sentencing Guidelines

■ The trial court set the defendant's base offense level at thirty-three and then added two levels for an obstruction of justice under U.S.S.G. § 3C1.1 because of the defendant's "numerous false statements to the authorities" and his testifying falsely under oath at trial. The court added two more levels for a total offense level of thirty-seven under § 3A1.1 for a vulnerable victim. The defense does not challenge either of these enhancements or the base level of thirty-three. The defendant does argue, however, that the court erred in departing upward from the base level sentence of thirty-three, claiming that the court failed to clearly articulate its reasons for the upward departure. We apply a three-step approach when analyzing upward departures:

> [W]e begin with a *de novo* review of the court's stated grounds to ascertain that they are of a kind that may be relied on to justify a departure. If they are, we then review the facts underlying the departure, and will reverse the district court only if its factual findings were clearly erroneous. Finally, we review the degree of departure to determine if it was reasonable, . . .

*Torres,* 977 F.2d at 329.

■ The court's stated reason for the upward departure was that the Guidelines base level of thirty-three [15] failed to take into

---

**15.** The sentencing judge arrived at the base level of 33 through application of U.S.S.G. § 2K1.4(c) (arson) and U.S.S.G. § 2A1.2(a) (second degree murder). Section 2K1.4(c) instructs the sentencing judge "If death resulted [from the arson], or the offense was intended to cause serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Per-

son) if the resulting offense level is greater than that determined above." In referring to Chapter Two, Part A, the judge remarked that Menzer's criminal conduct constituted either first degree murder or second degree murder and although it was a "close" question, the judge opted for second degree murder and a base level of 33.

consideration multiple deaths, i.e., Menzer would have received a base level of thirty-three if only one child had died. The court reasoned that in view of the fact two children died and another child as well as the mother were victims of the "extreme violence" perpetrated by Menzer, an upward departure was appropriate. The trial judge stated that because the difference between second degree murder (base level thirty-three) and first degree murder (base level forty-three) was so great that a five-level upward departure more accurately reflected the severity of the defendant's conduct.

We are of the opinion that the court's stated grounds for departure, i.e., the Guideline's failure to consider the combination of multiple deaths as well as the extreme violence perpetrated on his wife and only surviving child (they were hospitalized due to smoke inhalation and injuries sustained while jumping from a third floor window), constituted a valid basis for departing upward under Guideline section 5K2.1. The Guidelines explain that death is an appropriate factor to consider in departing upward:

> If death resulted, the court may increase the sentence above the authorized guideline range.

> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury....

U.S.S.G. § 5K2.1, p.s. Not only was the court's stated grounds for departure valid under the Guidelines, but there was nothing clearly erroneous about the court's reliance on the facts presented at trial in arriving at the decision to depart upward from the Sentencing Guidelines. Finally, the defendant's

heinous conduct (arson resulting in the death of two children) certainly merits the upward departure of five levels. The five-level upward departure placed the defendant at a base level of thirty-eight which was halfway between second degree murder (level thirty-three) and first degree murder (level forty-three). We think a base level of thirty-eight accurately and properly reflects the severity of the defendant's conduct and thus affirm the trial court.

*Conclusion*

The conviction and sentence of Michael Menzer are

AFFIRMED.