**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gary Lamont CURRY, Defendant– Appellant.**

No. 95–1395.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1995.

Decided March 27, 1996.

Robert Lee Garrison, Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Thomas R. Murphy, Jr., Watson & Murphy, Eldorado, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUDAHY and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Gary Lamont Curry was indicted on one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). A jury found him guilty as charged and the district court sentenced him to 121 months' imprisonment, to be followed by a term of four years supervised release, and imposed a $500 fine as well as a special assessment fee of $50. Curry appeals his conviction. We AFFIRM.

## I. FACTUAL BACKGROUND

On July 30, 1994, at approximately 4:00 a.m., Police Officers Bryan, Forrester, Hankins and Corry were on duty at the Elmwood Housing Project ("Elmwood") in Cairo, Illinois. The officers were in conversation when Bryan and Forrester observed a man they recognized as Gary Curry walking through the project.[1]

The officers were aware that a domestic violence complaint had been filed against Curry that evening, so Forrester proceeded to shine a spotlight on the defendant as Bryan exited his car to approach Curry. Bryan stated that he lost sight of the defendant for a few seconds, but quickly regained his view of him. When the officer was approximately fifteen feet away, Bryan observed Curry step over toward a bush, reach "down toward his pocket," lean over the shrubbery and make a movement as if he were dropping an object into the bush. Curry immediately moved away from the foliage and raised his hands in the air.

At this time, Bryan informed Curry that he was under arrest, and ordered the defendant to place his hands behind his back and turn around to be handcuffed. As Bryan proceeded with the arrest, he requested that Forrester, Corry, and Hankins retrieve the item the defendant had dropped in the bush. As Corry reached down to pick up a stick, Bryan informed him that he was not in the same location where he had observed Curry drop the object. Although at that time Curry stated that the stick was what he had deposited in the bush, Bryan pointed out the location of the defendant's drop to Hankins and Forrester, who both testified that they immediately re-directed their search to that area and discovered a plastic baggie[2] containing a substance that the officers believed to be cocaine base (commonly known as "crack").[3] Hankins retrieved the packet from under the bush.

Curry was searched at the scene of his arrest and on his person the officers found a beeper in operational mode and $182 in cash. Curry then was conveyed to the Cairo Police Department, photographed, fingerprinted, and placed in a holding cell. FBI Agent Brenn Tallent with the Federal Public Housing Drug Task Force in the Springfield Division of the FBI was called to the station to question Curry. Tallent and Special Federal Officer Lester Murray, also a member of the Task Force, interviewed the defendant at the police station. Tallent began his inquiries by displaying to Curry the Cairo Police Department's Advice of Rights card, which the Cairo police officers had Curry sign in order to acknowledge that he had been read and understood his Miranda rights.[4] Tallent asked Curry if that was his signature on the card, to which he responded in the affirmative, and the defendant reiterated that he was informed of and understood his rights. Ac-

1. During his trial testimony, Officer Bryan stated that he had contact with Curry the previous night, after arresting another individual for criminal trespass. Curry was in a parked car, observing the arrest, and after the police conveyed the arrestee to the precinct, they noticed that Curry had followed them to the station parking lot. Later that evening, Bryan pulled the defendant over in a traffic stop to find out why he came to the department, and requested that the defendant produce his license and auto insurance. According to Bryan, at this point Curry started yelling loudly, waking up people in the neighborhood. Curry was not arrested, but Bryan recognized him the following night in Elmwood.

Curry relates a different version of the events of his previous meeting with Officer Bryan. He testified that he was out driving when he saw some police officers kicking a black man who was on the ground. The defendant asserted that he sat in his car and observed the officers, who stopped kicking the man once they noticed him watching. The defendant alleged that he then followed the police to the station to make sure that the arrestee was alright, and that Bryan stopped him later that night to find out why he was following them.

2. Officer Bryan testified that to the best of his knowledge, this baggie was never dusted for fingerprints, nor was the stick, because the area in which they were dropped was wet and grassy.

3. Later the night of the arrest, back at the station house, Lieutenant James Wright, Chief of Field Operations for the Cairo Police Department, performed a field test on the substance in the bag and it tested positive for cocaine. Daniel Lecocq, a forensic scientist for the Illinois State Police Lab, performed another analysis of the white substance and he too determined that it was crack cocaine.

4. The record fails to reflect precisely when Curry was read his rights.

cording to Tallent, Curry then replied that he wished to speak with the agents about his involvement in the distribution of crack cocaine.

Agents Murray and Tallent each testified that Curry informed them that he been dealing crack since Spring of 1991 and named ten different dealers he had worked with in the past, some of whom resided in Elmwood. The defendant allegedly also revealed that he typically sold drugs in and around the Cairo Housing Projects, primarily at Elmwood. When the officers inquired of Curry concerning the crack cocaine in the baggie that they had recovered that morning, according to Tallent the defendant admitted that it was his, and that he had taken it from his girlfriend that night, after they had a fight. Tallent further testified that Curry informed them that he brought the drugs to the project to "get rid of them or something to that effect."

During the jury trial, Curry's version of events differed significantly from the officers' and agents' testimony. The defendant stated that he and his girlfriend had a fight during the evening of July 29, and that as they were driving home, she jumped out of the car and stormed off. He went out to look for her at four in the morning, at which time he claimed to be carrying a piece of a broom or mop handle to fight off any dogs that might jump out and attack him. His search took him to the Elmwood project and while there, the police drove up to him and shone a spotlight in his face. Curry testified that at first he kept walking but when he recognized Officer Bryan, he threw away the stick and put his hands in the air. Bryan promptly arrested and cuffed him. Curry denied walking toward the bush, reaching toward his pockets, and being in possession of the baggie of crack.

The defendant testified that after he was transported to the police station, he gave the officers a statement denying his possession of the baggie found under the bush and was then taken to a cell where he went to sleep. After he was awakened and given breakfast, the officers asked him to make another statement. Curry responded that he had previously given an account of the events and claimed he was then conveyed to a small room where he met Agent Tallent. According to the defendant, Tallent also asked him to make a statement and he stated that he had given one previously to the Cairo officers and declined to make another. Curry denied that Tallent had either read him or explained his constitutional rights and that he had displayed the Cairo Police's Advice of Rights card which the defendant had signed. Curry maintains that at that time he then penned a half-page statement in which he again denied his possession of the crack, which Tallent read and the defendant signed.

After this, Curry alleges that he was escorted to his cell, only to be taken back to speak with Tallent twenty minutes later. At this time, the agent, referencing the written statement, allegedly stated "this ain't going to work, Gary." Curry admitted that he informed Tallent that he had used drugs in the past, but he denied telling him that he had ever dealt drugs, or that he named any past or present suppliers. The defendant then averred that Tallent tore up the handwritten statement and told him to return to his cell. Curry also testified that Tallent was the only agent in the room, and denied seeing or meeting Agent Murray until he testified in court.

At trial, the government presented three witnesses (Henry Moss, Michael Futrell, and Vernon Trenton) who had previously purchased crack cocaine from the defendant between 1991 and 1994. All three had pled guilty to federal narcotics offenses and entered into plea agreements that promised a recommendation to the court for a possible reduction in their sentences in return for truthful testimony concerning their drug dealings with Curry. Before the trial, the government filed a motion informing the defendant that it intended to call these three men as witnesses to relate accounts of their prior drug dealings with Curry.[5] The defendant objected to their testimony, arguing that it was inadmissible under Fed.R.Evid. 404(b) because its sole purpose was to establish that he had a propensity to deal crack.

---

**5.** All three men were incarcerated at the time of Curry's arrest on July 30, 1994.

The district judge disagreed, and admitted the evidence for the purpose of proving Curry's intent to distribute cocaine on the night of his arrest, and found that the probative value of the testimony outweighed the risk of unfair prejudice.

Moss, serving a twenty-one year federal sentence for conspiring to and selling cocaine in 1994, testified that he knew Curry prior to his own arrest, and that the defendant Curry made a living selling crack cocaine in the Elmwood and McBride Housing Projects. Moss stated that he purchased crack from Curry, and often re-sold it for his own profit to pedestrians and motorists in Elmwood. Moss also testified that on one occasion, he sold some cocaine base for Curry, and returned the money to the defendant after the deal was consummated. Moss additionally stated that the defendant kept his supply of crack in plastic baggies.

Futrell pled guilty to conspiring with intent to distribute cocaine and was awaiting sentencing at the time of Curry's trial. Futrell testified that he had known Curry since 1991, and had made 30 or 40 crack cocaine buys from him during the first two months of 1994 alone. He also asserted that the defendant Curry kept his stash of drugs either in medicine bottles or plastic baggies, and that Curry usually made his sales between three and five o'clock in the morning, at Elmwood. Futrell further testified that he had observed the defendant selling crack at the McBride Project during 1990, 1991, and 1992.

Finally, Trenton, serving a 36 month sentence for distribution of crack cocaine, testified that he had known Curry all his life and that as late as May of 1994, the defendant was making a living selling crack cocaine in the McBride Project as well as at Elmwood. Trenton stated that he had purchased drugs from Curry at Elmwood over 100 times between early 1993 and May of 1994, much of which he received on credit, re-sold it, and returned the proceeds to the defendant. He recounted that Curry kept the crack in a plastic sandwich bag, that he personally usually made his purchases between seven and eight in the morning, and that between early 1993 and May of 1994, Trenton witnessed

"quite a few" other customers buy drugs from the defendant.

When Curry testified, he stated that although he "knew of" Moss and Futrell, he had never personally met them, nor did he deal drugs with either of them. He did admit that he knew Trenton, but only because they had engaged in a few fistfights over a woman they were both interested in dating. Curry steadfastly denied engaging in drug deals with Trenton.

After trial, the jury returned a verdict of guilty, finding that Curry possessed cocaine base with the intent to distribute at the time of his arrest. The defendant appeals his conviction.

## II. ISSUES

Curry raises two issues on appeal: (1) whether the trial judge abused his discretion when he admitted the testimony of Futrell, Moss and Trenton; and (2) whether the evidence presented is sufficient to sustain his conviction beyond a reasonable doubt.

## III. DISCUSSION

### A. PRIOR BAD ACTS

Curry contends that the district court abused its discretion when it admitted the testimony of Moss, Futrell and Trenton: (1) because these three men were incarcerated at the time of Curry's arrest, none of them could have had any idea as to whether he intended to sell crack in Elmwood on July 30, 1994; therefore, their testimony was admitted solely to establish his propensity to commit the crime charged; (2) because they were not credible witnesses, their testimony was insufficient to establish that he actually dealt cocaine in the past; and (3) the probative value of their testimony was substantially outweighed by the risk of unfair prejudice.

■■ Our review of the trial court's admission of testimony is very limited: "We review the district court's decision to admit ... disputed evidence for an abuse of discretion." *United States v. Wilson,* 31 F.3d 510, 514 (7th Cir.1994) (citations omitted). "The decision to admit evidence will be reversed only when it is clear that the questioned

evidence had no bearing upon any of the issues involved at trial." *United States v. Torres,* 977 F.2d 321, 327 (7th Cir.1992) (quotation omitted). The district judge's determination of the admissibility of evidence "is treated with great deference because of the trial judge's first-hand exposure to the witnesses and evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." *Id.* at 329 (citation omitted).

 "Under Federal Rule of Evidence 404(b), evidence of other misconduct is not admissible to show that the defendant acted in conformity therewith, but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, or identity." *Wilson,* 31 F.3d at 514 (citations omitted). We follow a four-part test to decide whether 404(b) evidence was properly admitted:

> the court must determine whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue;[6] (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Id.* at 514–15 (citations omitted, emphasis added).

 Turning to the first element in *Wilson,* it is well-established law that "[w]hen a defendant is charged with a specific intent crime, the government may present other acts evidence to prove intent." *United States v. Smith,* 995 F.2d 662, 672 (7th Cir. 1993), *cert. denied sub nom., Marren v. United States,* ─── U.S. ───, 114 S.Ct. 718, 126

L.Ed.2d 683 (1994) (citation omitted); *see also United States v. Brown,* 34 F.3d 569, 573 (7th Cir.1994), *cert. denied,* ─── U.S. ───, 115 S.Ct. 1136, 130 L.Ed.2d 1097 (1995) ("under certain conditions prior bad acts may be admitted as proof of an element of a crime, such as intent, if the act demonstrates how the defendant's behavior was purposeful rather than accidental").

Moss, Futrell, and Trenton demonstrated through their testimony the following facts: (1) between February and May of 1994 (the period of time when Moss, Futrell, and Trenton were arrested), Curry was making his living selling crack cocaine; (2) each witness frequently purchased cocaine base from the defendant between the 400 and 500 row of the housing units in Elmwood in the two to four months preceding Curry's arrest in the case at bar; (3) Curry kept his crack in a plastic baggie, in his pants pocket; and (4) Futrell asserted that he usually purchased drugs from the defendant between 3 a.m. and 5 a.m., and Trenton stated that he made his purchases between 7 a.m. and 8 a.m.

These facts were relevant to establishing Curry's intent to distribute crack because they demonstrated that the defendant engaged in the practice of selling crack in plastic baggies which he kept in his pants pocket, at the Elmwood and McBride Housing Projects, between 1991 and 1994, in the morning hours, between the 400 and 500 row of the housing units. When the defendant was arrested in the early morning, he was in Elmwood one row away from his usual place of sale, and a baggie of crack was discovered under the bush into which he appeared to drop an object he withdrew from his pants pocket. The testimony of Moss, Futrell, and Trenton aided the government in establishing that Curry's conduct on the morning of his arrest was "purposeful rather than accidental," *Brown,* 34 F.3d at 573, and was

---

6. During oral argument, Curry's attorney stated that the defendant contested the applicability of each prong of the 404(b) admissibility test, yet Curry failed to argue how the prior acts were not similar or close enough in time to the charged conduct in either his brief or during his oral argument. Thus, we deem his argument concerning the similarity and temporal proximity element of the prior acts test waived, and decline

to deal with it, except to note that relying on circuit case law, a period of seven years is sufficiently close in time for the 404(b) analysis, *United States v. Kreiser,* 15 F.3d 635, 640–41 (7th Cir.1994), and as we discuss, *infra,* the crimes to which Moss, Futrell, and Trenton testified are similar enough to the crime charged to be relevant to a matter in issue.

properly admitted to demonstrate the defendant's intent to distribute crack at the time he was apprehended by the Cairo Police officers.

■ Curry also asserts that the government failed to meet the second prong of the *Wilson* test because the evidence was insufficient to establish that he committed the similar acts. His main contention is that Moss, Futrell and Trenton were not credible witnesses because they were testifying in the hopes of reduced sentences. In addition to testifying in the hope of receiving a reduced prison sentence, Moss and Futrell admitted that they had been formerly addicted to drugs. In *United States v. Garcia,* we examined a similar situation, in which the defendant challenged the credibility of two government witnesses who testified against him at his sentencing hearing in exchange for reduced sentences. 66 F.3d 851, 857, n. 6 (7th Cir.1995). Although Garcia argued that the witnesses were likely to fabricate their testimony in order to have their prison time lessened, we reiterated our position that "witnesses' motives for testifying do not render their testimony inherently unreliable," and stated that "such arguments are wasted on an appellate court because questions of credibility are solely for the trier of fact." *Id.* (quotations omitted).

Although defense counsel thoroughly challenged the credibility of Moss, Futrell, and Trenton before the jury, the jurors obviously believed the government witnesses nonetheless. We refuse to second-guess the jury's credibility determinations for "in this imperfect world, a litigant must often take the witness as he or she is, imperfections and all. We cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, ministers, priests, and nuns." *Garcia,* 66 F.3d at 857 (quotation omitted). Furthermore, during cross-examination, defense counsel did a thorough job of exposing the weaknesses in the witnesses' credibility to the jurors, and in *Smith,* we held that when a witness's motive for testifying was fully explored on cross-examination, the jury was able to fully assess their credibility, and we declined to question that determination. 995 F.2d at 672. Curry had ample opportunity

to attack the witnesses' credibility and, in fact, did so; the jury was well aware of the infirmities in each witness's credibility, but chose to believe them in spite of that knowledge.

■ Curry also claims that the testimony of Moss, Futrell, and Trenton was unworthy of belief because their stories failed to corroborate each other. However, each man spoke about their *individual* dealings with Curry, not a joint conspiracy in which they all participated. Furthermore, Moss, Futrell and Trenton all agreed on three damaging facts: (1) Curry sold crack on a regular basis, (2) in the projects, and (3) usually kept his stash in plastic baggies. This data also corroborated Agent Tallent's and Agent Murray's account of the details provided them by the defendant concerning his drug deals. The testimony of Moss, Futrell, and Trenton provided substantial evidence of Curry's involvement in the sale of crack, and was "sufficient to support a jury finding that the defendant committed the similar act[s]" which were the subject of the 404(b) evidence. *Wilson,* 31 F.3d at 514–15.

■ The last element in *Wilson's* 404(b) analysis is that we examine Fed. R.Evid. 403, which "requires that the probative value of the evidence outweigh its unfair prejudicial effect." *United States v. Menzer,* 29 F.3d 1223, 1234 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 422 (1994). "[O]ur decisions have emphasized that most relevant evidence is, by its very nature, prejudicial, and that evidence must be *unfairly* prejudicial to be excluded. Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Pulido,* 69 F.3d 192, 201 (7th Cir.1995) (citations and quotations omitted). "[T]he more probative the evidence, the more the court will tolerate some risk of prejudice." *Menzer,* 29 F.3d at 1234 (quotation omitted, alteration in original).

We agree with the defendant that the testimony of Moss, Futrell and Trenton was prejudicial to his case in that it aided the

government in proving his guilt beyond a reasonable doubt; however, it was damaging because it was probative of Curry's intent to distribute crack cocaine on the morning he was arrested. These three men each testified that the defendant regularly sold crack from plastic baggies, in the Elmwood and McBride Projects. This *modus operandi* was identical to Curry's activity on the morning in question, and in light of its relevance and bearing on the question of Curry's guilt, we are of the opinion that its probative value outweighed the risk of unfair prejudice.

"Moreover, the district court provided jurors with limiting instructions which restricted their consideration of the evidence," *United States v. Wright*, 943 F.2d 748, 751 (7th Cir.1991) (citation omitted), and informed them that:

> You have heard evidence of acts of the defendant other than those charged in the indictment. You may consider this evidence only on the question of determining motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. *This evidence is to be considered by you only for this limited purpose.*

(emphasis added); *see Menzer*, 29 F.3d at 1234 ("we are confident that any prejudice was minimal because the court did everything in its power to reduce any possibility of prejudice by instructing the jury not to consider the evidence for any other purpose" than the ones enumerated by the court). We rely on our assumption that jurors follow their instructions, *United States v. Davis*, 15 F.3d 1393, 1402 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 250, 130 L.Ed.2d 171 (1994), and hold that the 404(b) evidence was properly admitted to establish the defendant's intent to distribute crack on the morning of his arrest, and furthermore, that the court's admission of this evidence was not unfairly prejudicial in light of its probative value, the trial judge's careful limiting instruction cautioning the jury to consider the testimony only for proper purposes, and defense counsel's cross-examination.

## B. SUFFICIENCY OF THE EVIDENCE

Curry's second contention is that without the improperly admitted 404(b) testimony, the evidence the government produced was insufficient to establish beyond a reasonable doubt that he was in possession of crack with the intent to distribute. He argues that the government failed to prove that he possessed the drugs because no one saw the crack cocaine in his hands or on his person. He further contends that the only evidence that established his intent to distribute the cocaine base was the improperly considered testimony of Moss, Futrell, and Trenton.

■■■ "In challenging the sufficiency of the evidence to support [a] conviction, [the defendant] bears a heavy burden." *United States v. Hill*, 40 F.3d 164, 166 (7th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1385, 131 L.Ed.2d 238 (1995).

> As this court has often stated, [i]t is not the function of this [appellate] court to reweigh the evidence or to substitute its judgment for that of the trier of fact. When reviewing challenges to sufficiency of evidence supporting a conviction we consider the evidence presented at trial in the light most favorable to the government; if we conclude that any rational trier of fact could have found that essential elements of the crime were proven beyond a reasonable doubt, we will reject the defendant's sufficiency challenge.... Because questions of credibility are solely for the trier of fact, such arguments are wasted on an appellate court.

*United States v. Hatchett*, 31 F.3d 1411, 1416 (7th Cir.1994) (citations and quotations omitted).

> As an appellate court, we will not second-guess the jury on [the credibility determination], which was best resolved through giving the ... jury the opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript].

*United States v. Lakich*, 23 F.3d 1203, 1210–11 (7th Cir.1994) (quotation omitted).

■ Leaving aside the 404(b) testimony for the moment, we will examine the remainder of the evidence upon which the jury could base its verdict of guilt. Officer Bryan observed Curry walk toward a bush, reach into his pants pocket, withdraw something and drop it into the shrubbery. Immediately thereafter, as the officer testified, he "instructed the other officers to retrieve the item which [Curry] dropped," and Officer Hankins recovered a plastic baggie containing 21.55 grams of crack, under the bush, in the exact spot to which Bryan directed him.

After he was arrested, Curry confessed to Agents Tallent and Murray that he made his living dealing drugs and that the crack belonged to him. He further admitted that he intended to sell the crack in Elmwood on the morning of his arrest. According to the agents, Curry also identified some ten people to whom he had sold crack between 1991 and 1994, specifying them by name, address, and the vehicles they drove. Agent Tallent memorialized his entire conversation with the defendant, including all the details of his past and present drug deals, in his FBI Form–302 interview report which he completed the same day he spoke with Curry.

■ Officers Corry and Hankins discovered a baggie containing crack under the same bush into which Officer Bryan had just seen Curry appear to drop an object. Agents Tallent and Murray testified that the defendant admitted that the cocaine base was his and that he intended to sell it in Elmwood on the morning of his arrest. Although Curry's testimony at trial contradicted that of each of the four officers and two federal agents who appeared at trial (whose testimony in respects corroborated the testimony of each other), the jury obviously believed the six law enforcement officials rather than the defendant, and we refuse to question their credibility determination on appeal. *Hatchett*, 31 F.3d at 1416.[7]

■ Additionally, FBI Agent Robert Dueker[8] testified that the crack recovered from under the bush was "a distributable amount," and that "a user would not have this kind of quantity basically because he would be afraid of being ripped off, he would be afraid of having to share it with too many people he was with."[9] As our case law makes clear, "[i]ntent to distribute can be inferred from the possession of a quantity of drugs larger than needed for personal use." *United States v. Maholias*, 985 F.2d 869, 879 (7th Cir.1993). Dueker also stated that drug dealers often use beepers like the one that was found on the defendant at the time of his arrest, to conduct their illegal business.[10]

7. The defendant and the government each discuss whether or not Curry was in constructive possession of the baggie of crack. However, in light of the testimony of Agents Tallent and Murray, which was clearly plausible and believed by the jury, we decline to address the constructive possession arguments, as they are unnecessary for the resolution of the issue before us.

8. Dueker had been an Agent for 22 years, and has spent the last twelve years of his career investigating primarily drug cases. He supervised ten agents and numerous deputy special federal officers in 30 counties in Southern Illinois, and during the course of his drug investigations, had interviewed between 100 and 150 crack addicts. He had also completed between 120 and 160 hours of FBI training courses in narcotics investigations.

The government failed to effectively proffer Dueker as an expert in the field of narcotics investigations, but defense counsel did not object when the prosecutor posed the agent questions requesting his "expert opinion" concerning the amount of crack found at the scene of Curry's arrest.

9. Agent Dueker also testified that an ounce of crack would provide an average user with a sixteen day supply of drugs, whereas a heavy user would consume an ounce in approximately eight days. The amount recovered when Curry was arrested was slightly less than an ounce.

10. Agent Dueker gave three reasons for the use of pagers: (1) the dealer "would be able to be contacted at anytime and not have to sit around home and wait for phone calls," (2) the parties to the drug deal "could talk on pay telephones by beeping someone and avoid the possibility of someone listening to your telephone conversations by wiretap," and (3) "[i]f you use beepers, you would avoid having any numbers you've contacted and people you've talked with shown on [your] telephone bill."

When queried about the beeper at trial, Curry alleged that he had found it a year before arrested, but that he never used it, and only carried it to make him "look cool," and "feel important."

Between the money, the quantity of drugs in Curry's possession, and the beeper, the defendant certainly had the necessary and all-too-familiar "tools" of the drug dealing trade, and his intent to distribute drugs could easily be inferred from this evidence. *See, e.g., United States v. Betts,* 16 F.3d 748, 757 (7th Cir.1994) (noting that pagers and Ziplock baggies are "hallmark paraphernalia" of the drug trade); *United States v. Solis,* 923 F.2d 548, 550 (7th Cir.1991) (recognizing that beepers are a common tool of the drug trade).

Finally, when we consider the totality of all the evidence, including the testimony of Moss, Futrell, and Trenton (which we previously held was properly received in evidence), it is clear that the jury received an abundance of reliable and damaging information from which they could conclude that Curry had been dealing crack in Elmwood on an ongoing basis since 1991, and that he was in possession of crack which he intended to sell on the night of his arrest.

AFFIRMED.