85 F.3d 632
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rodrigo B. GONZALEZ, Defendant-Appellant.
 No. 95-1176.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 28, 1995.
Decided May 13, 1996.
 
 Before WOOD, Jr., COFFEY and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 A jury convicted Rodrigo B. Gonzalez of conspiring to distribute marijuana between March 1993 and January 13, 1994, in violation of 21 U.S.C. §§ 841(a)(1) & 846, and two counts of conducting financial transactions with proceeds from unlawful activities (money laundering), in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) & (a)(2). The district court sentenced him to 235 months' imprisonment on each count, sentences to be served concurrently, and followed by four years of supervised release with a fine of $20,000 and a special assessment of $150. Gonzalez appeals his conviction and sentence. We AFFIRM.
 
 I. BACKGROUND
 
 2
 On March 9, 1993 Rodrigo Gonzalez, a marijuana supplier from Arizona, joined Jerry Parker, a marijuana distributor, for breakfast at the Ramada Inn in Evansville, Indiana. The two men were engaged in the drug business before, but with a middleman, which they now agreed to eliminate. Gonzalez proposed to supply Parker with marijuana for distribution throughout Indiana and the midwest. Parker agreed and met with one of Gonzalez's accomplices, Robert Smith, who had a van waiting at the motel in which he had transported 136 pounds of marijuana from Arizona. Gonzalez turned the drugs over to Parker on credit, to be paid for with the cash proceeds of their ultimate sale (a common transaction between drug dealers known as "fronting"). Parker sold a portion of the narcotics the next day and returned the van to Gonzalez, along with a partial drug sale payment of $80,000. Gonzalez returned to Arizona while Smith waited at the Ramada Inn motel for the money due from Parker; the following day Parker sold the rest of the 136 pounds of marijuana and gave Smith $53,000 in payment.
 
 
 3
 Returning to Arizona to join his accomplice Gonzalez, Smith was stopped by the Evansville police. Although the details of the stop are not in the record, it appears that during a search the police found cocaine and marijuana in his van. Smith was arrested for possession of the narcotics and was released on bail.
 
 
 4
 The next contact between Parker and Gonzales occurred in October 1993. At that time, Gonzalez was being held in Mexico by drug suppliers to whom Gonzalez owed money. Gonzalez telephoned Parker and asked for help (cash); Parker agreed to sell drugs for Gonzalez and mail him the proceeds to pay off the debt. Gonzalez informed Parker that there was sixty pounds of marijuana on Gonzalez's ranch in Arizona and instructed him to retrieve it and sell it. Parker drove to Arizona, located the marijuana, returned to Ohio and sold the drugs. Gonzalez directed Parker to mail the proceeds (about $40,000) to a certain address; After receiving the money, Gonzalez turned it over and secured his release from the drug dealers in Mexico.
 
 
 5
 On December 19, 1993, after Gonzalez was freed from Mexico, he met with Parker at his home in San Manuel, Arizona to arrange another narcotics transaction. Gonzalez sold Parker sixty pounds of marijuana and directed him to a motel in New Mexico to receive an additional fifty-two pounds of the narcotic; Parker paid Gonzalez a total of $27,000 as a down payment at this time.
 
 
 6
 While driving back to Indiana with the marijuana on board, Parker became paranoid, believing that he was being followed by the police when in fact he was not. As a result of his paranoid state, he abandoned his vehicle in Arkansas. Parker next stole a car, drove to Tennessee and took a taxicab to Benton, Kentucky where he turned himself in to the local Sheriff's Department and advised them that he was a drug courier, and agreed to cooperate with law enforcement.
 
 
 7
 The police department in Kentucky contacted the Federal Drug Enforcement Agency (the "DEA") and together the officers arranged for Parker to make a recorded telephone call to Gonzalez: During the conversation, Parker told him that he had sold the drugs and had cash to give Gonzalez. Gonzalez flew to Kentucky and met with Parker who gave him $5,000 (supplied by law enforcement); At this time, Parker and Gonzalez went to a storage facility near the airport to turn over the remainder of the cash; DEA agent were in wait and placed him under arrest.
 
 
 8
 Gonzalez was indicted in Indiana along with Robert Smith (the courier arrested in Evansville, Indiana) with conspiring to distribute marijuana and money laundering. Jerry Parker entered into an immunity agreement[1] with the United States through its attorney and agreed to testify truthfully against Gonzalez and Smith. On the eve of trial, Smith entered a plea agreement and likewise agreed to testify against Gonzalez.[2]
 
 
 9
 Rodrigo Gonzalez's jury trial was held in August 1994. Jerry Parker not only testified as to the events of the charged conspiracy from March 1993 to his arrest in January 1994, but also described his drug dealings with Gonzalez prior to that time.[3] Parker stated that he began dealing with Gonzalez in June 1991, receiving approximately eight shipments of 125 to 200 pounds of marijuana from 1991 to 1993 and distributing the drugs in Indiana and Ohio.
 
 
 10
 An individual, James Rose[4], also testified for the government regarding Gonzalez's marijuana dealings prior to the dates of the charged conspiracy (Gonzalez made the same objection to this testimony--that it was improper evidence of prior bad acts--but the trial judge ruled it was relevant to Gonzalez's intent. See footnote 2). Rose stated that Gonzalez "fronted" him marijuana (through a middleperson, Lisa Zammit) from 1987 to April 1990. According to Rose, Gonzalez supplied him with drugs to distribute at least twenty times, with each load averaging 150 pounds.
 
 
 11
 Anthony Justus, a drug courier for Gonzalez, also testified that he delivered six to eight loads of marijuana for Gonzalez from Arizona to Indiana, each load weighing approximately 150 to 200 pounds, between April and July of 1993. In July 1993 while transporting 103 pounds of marijuana for Gonzalez, he was stopped and arrested after the police found the drugs (the details of the stop, arrest and charge are not in the record).[5] While on bail release in August of 1993, Justus drove seven more shipments of marijuana from Arizona to Indiana, with each load weighing from 50 to 100 pounds.
 
 
 12
 A jury convicted Gonzalez of conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) & 846, and two counts of financial transactions with proceeds from unlawful activities (money laundering), in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) & (a)(2).
 
 
 13
 At the sentencing hearing, Agent Hinkle of the Internal Revenue Service testified that during the course of his investigation and prosecution of Gonzalez, he interviewed Greg Parker (son of the distributor, Jerry Parker). According to Hinkle, Greg Parker stated that he and his father began receiving monthly shipments of marijuana weighing from 150 to 400 pounds from Gonzalez in October 1991, and the shipments continued until February 1993, with the exception of the months of June and July of 1992 when they received no marijuana shipments. Greg Parker also informed Agent Hinkle that in February 1993 he and his father had purchased 236 pounds of marijuana from Gonzalez but abandoned it in Prescott, Arizona.
 
 
 14
 Based upon the testimony during trial and at the sentencing hearing, the district judge sentenced Gonzalez to 235 months imprisonment for each count, concurrently, to be followed by four years of supervised release, imposed a fine of $20,000, and a special assessment of $150. Gonzalez appeals his conviction and sentence.
 
 II. ISSUES
 
 15
 Gonzalez raises the following issues on appeal: (1) whether the district court erred when it determined that he had not been denied his right to a speedy trial; (2) whether the trial judge abused his discretion when he allowed Rose and Jerry Parker to testify concerning his alleged involvement in the marijuana trade prior to the period charged in the indictment; (3) whether he was denied his Sixth Amendment right to cross-examination and his Fourteenth Amendment right to due process and fundamental fairness by the government's untimely tender of Smith's answers to the interrogatories; and (4) whether the district judge committed clear error in assessing his relevant conduct for sentencing purposes.
 
 III. DISCUSSION
 A. SPEEDY TRIAL
 
 16
 Gonzalez claims that his right to a speedy trial under 18 U.S.C. § 3161 was violated because he was not tried within seventy days of his arraignment. "The Speedy Trial Act mandates that a defendant who has pled not guilty must be tried within seventy days after the filing of an indictment, or the date on which the defendant first appears before a judicial officer, whichever is later." United States v. Garrett, 45 F.3d 1135, 1137 (7th Cir.), cert. denied, 115 S.Ct. 2015 (1995) (citing 18 U.S.C. § 3161(c)(1)). However, not all calendar days that elapse between the time of indictment and trial are counted within the seventy-day limit; certain periods of delay are excluded from the speedy trial calculations. See 18 U.S.C. § 1361.
 
 
 17
 After a hearing, the trial court determined that Gonzalez right to speedy trial had not been violated because the seventy day time limit had been tolled due to the motions made on behalf of Gonzalez's co-defendant, Robert Smith. We review the district court's determination regarding exclusions of time with deference: "[a]bsent legal error, exclusions of time cannot be reversed except when there is an abuse of discretion by the court and a showing of actual prejudice." United States v. Ruth, 65 F.3d 599, 605 (7th Cir.1995) (quoting United States v. Marin, 7 F.3d 679, 683 (7th Cir.1993), cert. denied, 114 S.Ct. 739 (1994)). "This court reviews a district court's interpretation of the Speedy Trial Act de novo and it reviews the district court's factual findings for clear error." United States v. Wimberly, 60 F.3d 281, 284 (7th Cir.1995) (citing United States v. Culp, 7 F.3d 613, 617 (7th Cir.1993)). The chronology of Gonzalez's relevant pre-trial events is as follows:
 
 
 18
 Gonzalez and Robert Smith were formally indicted on February 15, 1994 and trial was set to commence on March 21, 1994.
 
 
 19
 On March 21 the district judge granted Smith's motion for a continuance (the trial was rescheduled for June 27).
 
 
 20
 On June 14 a superseding indictment was filed adding two counts of money laundering against Smith and Gonzalez.
 
 
 21
 On June 22 the district judge granted Smith's second motion for continuance (the trial was rescheduled for August 22, 1994).[6]
 
 
 22
 On July 26, 1994, Smith filed a motion to suppress the evidence against him. On August 15, 1994, Gonzalez filed a motion to dismiss the charges against him, arguing that his right to a speedy trial had been violated.
 
 
 23
 August 22, 1994 (the date of trial), the trial judge denied Gonzalez's motion finding that Smith's motions for continuance on March 16 and June 16 tolled the time period (Smith's suppression motion was dismissed at moot because he entered into a plea agreement and pled guilty).
 
 
 24
 Gonzalez's speedy trial clock began to run on February 16, 1994,[7] the day of his first appearance before a magistrate when he was ordered detained pending trial. The trial court excluded from the speedy trial calculations the period between March 21 to June 27 due to co-defendant Smith's motion for a continuance (Smith requested the continuance to complete discovery). Gonzalez does not dispute this exclusion.
 
 
 25
 However, Gonzalez does contest Smith's second motion for a continuance (granted June 22 over the objection of Gonzalez) which postponed the trial date from June 27 to August 22 and thus tolled the speedy trial clock for that period. Gonzalez asserts that the continuance was granted under § (h)(8)(A), which provides an exclusion of time for:
 
 
 26
 Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.
 
 
 27
 Gonzalez argues that the "ends of justice" fail to support the continuance and that the district court committed reversible error by not reciting specific reasons why the continuance was necessary. To the contrary, the district judge explicitly stated that the continuance was granted under both section (h)(8)(A) and section (h)(7) of the Speedy Trial Act. Section (h)(7) provides an exclusion for:
 
 
 28
 A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.
 
 
 29
 "This court has long held that, under § 3161(h)(7), 'the excludable delay of one defendant may be ascribed to all codefendants in the same case, absent severance." United States v. Tanner, 941 F.2d 574, 580 (7th Cir.1991), cert. denied, 502 U.S. 1102 (1992) (citing United States v. Dennis, 737 F.2d 617, 620 (7th Cir.), cert. denied, 469 U.S. 868 (1984)); United States v. Mustread, 42 F.3d 1097, 1106 (7th Cir.1994). Although Gonzalez objected to the second continuance, the record before the court reflects that at no time during the trial proceeding Gonzalez ever made a motion for severance, nor was one granted.
 
 
 30
 "Whether the delay was reasonable depends on the facts of the case." Tanner, 941 F.2d at 580. "A trial court's decision to grant a continuance under the Act is within the court's discretion and will not be reversed absent a showing of both abuse of discretion and actual prejudice." Wimberly, 60 F.3d at 284 (citing Tanner, 941 F.2d at 579).
 
 
 31
 In Gonzalez's case, a federal grand jury returned a superseding indictment against Gonzalez and Smith on June 14, adding the charges of money laundering to the charge of conspiring to distribute marijuana. Counsel for Smith, Gonzalez's co-defendant, requested the continuance on June 16, stating that he needed more time for discovery and trial preparation (trial was set at that time for June 27) in light of the additional charges. Although Gonzalez asserts that additional time was not necessary because the money laundering charges arose from the same facts supporting the drug conspiracy charge, the significance of the additional charges certainly required Smith's counsel to conduct research and perhaps further discovery. It is not unreasonable to request additional time for trial preparation in such circumstances. Thus, the district court did not abuse its discretion in granting the continuance.
 
 
 32
 Additionally, we note that on July 26 Smith filed a motion to suppress the introduction of evidence against him, concerning the drugs discovered in his vehicle in Evansville, Indiana in March of 1993. Although the district court did not rely on this motion to toll the speedy trial time clock, it is well established that the filing of such pre-trial motions constitutes excludable delay, even if filed after the pre-trial motion time schedule ordered by the district court. United States v. Garret, 45 F.3d 1135, 1138 (7th Cir.1995). Thus the period between July 26 and August 22 (disposition of the motion and start of trial) also constitutes excludable delay and resolves Gonzalez's claim that he was not brought to trial within the seventy-day time limit of the Speedy Trial Act.
 
 B. PRIOR BAD ACTS EVIDENCE
 
 33
 At trial, Jerry Parker (a unnamed co-conspirator) and James Rose testified regarding Gonzalez's involvement in the marijuana trade before March 1993, the time that the charged conspiracy began. Gonzalez argues that such testimony was improper and prejudicial because it was only used to establish his propensity to commit the crimes charged in the indictment. "Under Federal Rule of Evidence 404(b), evidence of other misconduct is not admissible to show that the defendant acted in conformity therewith, but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, or identity." United States v. Wilson, 31 F.3d 510, 514 (7th Cir.1994) (citations omitted, emphasis added).
 
 
 34
 "We review the district court's decision to admit the disputed evidence for an abuse of discretion." Id. (citations omitted). "The decision to admit evidence will be reversed only when it is clear that the questioned evidence had no bearing upon any of the issues involved at trial." United States v. Torres, 977 F.2d 321, 327 (7th Cir.1992) (quotation omitted). The district judge's determination of the admissibility of evidence "is treated with great deference because of the trial judge's first-hand exposure to the witnesses and evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." Id. at 329 (citation omitted).
 
 
 35
 In determining the admissibility of Rule 404(b) evidence, the court must determine whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.
 
 
 36
 Wilson, 31 F.3d at 514-15 (citations omitted, emphasis added).
 
 
 37
 In his appellate brief, the defendant "concedes that the testimony regarding the distribution of marijuana by him to Parker and Parker's son, through Barry Zimmerman, from 1991 to February of 1993, is evidence of prior acts similar to the conspiracy to distribute marijuana offense with which he was charged and close enough in time to the indicted conspiracy." Thus, we will confine our discussion to whether the evidence was admitted to demonstrate Gonzalez's propensity to commit the crimes charged and if its admission was unfairly prejudicial.
 
 
 38
 The district judge gave the following reasons for admitting Parker's and Rose's testimony about Gonzalez's drug activities between 1987 and February of 1993:
 
 
 39
 [A]lthough the defendant is not charged with any conduct that these two witnesses are going to testify to ... the Court believes it's proper to consider evidence of acts not alleged in the Indictment for limited purposes, being intent, knowledge, including motive, intent, opportunity, plan, preparation and so forth under 404(b). The Court concludes that the conduct or the acts being testified to are made for the purpose to establish an issue other than the defendant's propensity to commit the crime charged. It's similar evidence, similar acts, similar enough and close enough in time to be relevant to the matters at issue, and the evidence is such that the Jury can find that damage occurred and the defendant was the actor and under 403 that its probative value is not substantially outweighed by the danger of unfair prejudice, and it shows a common scheme or plan, and therefore, the Court finds it would be admissible evidence.
 
 
 40
 In Torres, 977 F.2d at 326, we stated that "other acts evidence of intent always relates to a matter at issue other than propensity when the defendant is charged with a specific intent crime." Gonzalez was charged with a violation of 21 U.S.C. § 841(a)(1), which criminalizes "knowingly or intentionally" distributing marijuana; thus, the defendant was charged with a specific intent crime and the admission of the prior bad acts evidence was proper according to our holding in Torres. Furthermore, the fact that the defendant Gonzalez had been engaging in marijuana distribution since at least 1987, establishes that he had a common scheme or plan to his conspiracy, that he acted with knowledge of his illegal transactions, and that he engaged in active preparation for his marijuana distribution, all of which establish specific issues of knowledge and intent under Fed.R.Evid. 404(b) other than his propensity to commit the crime.
 
 
 41
 In the context of our 404(b) analysis, we must also examine Fed.R.Evid. 403 which "requires that the probative value of the evidence outweigh its unfair prejudicial effect." United States v. Menzer, 29 F.3d 1223, 1234 (7th Cir.), cert. denied, 115 S.Ct. 515 (1994). "Relevant evidence is inherently prejudicial.... Rule 403 was never intended to exclude relevant evidence simply because it is detrimental to one party's case; rather, the relevant inquiry is whether any unfair prejudice from the evidence substantially outweighs its probative value." United States v. Lloyd, No. 94-3665, slip op. at 14 (quotation omitted). "[T]he more probative the evidence, the more the court will tolerate some risk of prejudice." Menzer, 29 F.3d at 1234 (quotation omitted, alteration in original).
 
 
 42
 "When balancing the prejudice and probative value, the courts of the various circuits have found the scale tipped in favor of admitting evidence of prior bad acts in cases where the acts involved, or explained, the circumstances of the crime charged, where the acts provided the background for, or development of, the crime charged, and where the acts completed the story of the crime on trial." Lloyd at 14 (quotation omitted). As the government points out, the jury needed to know of Gonzalez's prior dealings in order to determine the significance of Parker meeting with Gonzalez on March 10, 1993 at the Ramada Inn in Evansville, Indiana. Thus, the testimony of Parker and Rose provided the jury with a logical recounting of Gonzalez's role in the marijuana enterprise.
 
 
 43
 "Moreover, the district court provided jurors with limiting instructions which restricted their consideration of the evidence." United States v. Wright, 943 F.2d 748, 751 (7th Cir.1991) (citation omitted); see also Menzer, 29 F.3d at 1234 ("we are confident that any prejudice was minimal because the court did everything in its power to reduce any possibility of prejudice by instructing the jury not to consider the evidence for any other purpose" than the ones enumerated by the court).
 
 
 44
 While Parker was testifying, the judge instructed the jury that they were hearing testimony concerning events not charged in the indictment, and Gonzalez was not on trial for any of the conduct of which Parker was speaking. However, he also informed the jurors that they could consider the evidence for the limited purposes of the defendant's intent, motive, knowledge, common scheme or plan in relation to the crimes for which he was indicted. During Rose's testimony, the court gave an additional limiting instruction cautioning the jurors that the evidence being received could only be used to establish intent, preparation, plan, knowledge, or identity with respect to the charged conduct. The judge made clear to the jury that Gonzalez was not indicted for the transactions described by Rose.
 
 
 45
 Gonzalez asserts that the court's limiting instructions given during the testimony of Parker and Rose were different and thus prejudicial, resulting in jury confusion concerning the correct purpose of the testimony of Gonzalez's prior illegal acts. After reviewing the instructions referred to, we disagree with the defendant's theory of prejudice for we fail to see anything prejudicial about the instructions, for it is quite conceivable that each witness's testimony established different facts or purposes within the scope of Rule 404(b). Additionally, when the judge instructed the jury after closing arguments, he read the indictment and informed them that "you have heard evidence of acts alleged against the defendant other than those acts alleged in the indictment. You may consider this evidence only [as to] the question of intent, preparation, plan, knowledge, absence of mistake, or accident. This evidence is to be considered by you only for these limited purposes." Thus, any risk of jury confusion was eliminated by this clear and direct limiting instruction.
 
 
 46
 One final argument deserves brief mention. Gonzalez contends that Rose's testimony was prejudicial because it was "non-essential to anything that the government needed to prove in the way of a matter in issue." However, because he failed to raise the objection to Rose's testimony at trial, he has therefore waived this argument for purposes of appeal, and we will review only for plain error, one that "affect[s] substantial rights," and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings" only. United States v. Olano, 113 S.Ct. 1770, 1776-77 (1993). As detailed above, Rose's testimony established that Gonzalez was engaged in a scheme of marijuana distribution since 1987, and was only given to assist the jury in determining whether or not he committed the charged crimes "intentionally and knowingly," as is required by 21 U.S.C. § 841(a)(1). Therefore, contrary to Gonzalez's contention, Rose's testimony was essential to a matter in issue.
 
 
 47
 We hold that the testimony of Jerry Parker and James Rose was properly admitted in evidence to establish matters other than Gonzalez's propensity to commit the crimes charged, namely his intent, preparation, plan, knowledge, and absence of mistake or accident. Furthermore, in light of its probative value and the district judge's careful limiting instructions, we hold that its admission was not unfairly prejudicial.
 
 C. RIGHT TO CROSS-EXAMINE
 
 48
 Gonzalez argues that his constitutional right to cross-examine witnesses was impaired because the government failed to timely turn over impeachment evidence against Robert Smith, a co-conspirator and prosecution witness against Gonzalez.
 
 
 49
 Robert Smith had been arrested in March 1993 in Evansville, Indiana, driving back to Arizona with the $116,215 in cash he had received from Jerry Parker. The Evansville police seized the money. After Smith was released on bail, he filed a claim for the money the Evansville police had confiscated. While the forfeiture claim was still pending, Smith answered interrogatories in which he stated, under penalty of perjury, that the money seized belonged to Jerry Parker, to be used as capital for Parker's glass block business. Further, Smith stated on interrogatory that he was unaware that Gonzalez was involved in the distribution of drugs and that his trip to the hotel on March 10 and 11 was for "business purposes."
 
 
 50
 As described earlier, Robert Smith, plead guilty on the morning of trial, August 22. On August 24, the government decided that it would call Smith to testify against the defendant. During his direct examination, Smith admitted that he was involved in Gonzalez's drug transactions, that the money seized was the proceeds from the marijuana sales, and that he was present at the hotel for the purpose of engaging in the drug transactions. Smith's testimony was in direct contradiction to the interrogatory answers he gave to the government in 1993. After Smith had completed his direct, cross and re-direct examination, the government turned over to Gonzalez Smith's answers to interrogatories submitted to the government as part of the prior forfeiture action. Defense counsel conducted a re-cross examination and used the interrogatories to impeach Smith's trial testimony.
 
 
 51
 Gonzalez asserts that the government's tender of the interrogatories was untimely and thus violated his Sixth Amendment right to cross-examination and his Fourteenth Amendment right to due process and fundamental fairness. He maintains that if his attorney had had the answers earlier, his counsel could have used them to impeach Smith during his initial cross-examination, rather than in re-cross, and thus his attorney's impeachment of Smith would have been substantially more effective and therefore there was a reasonable probability that he would have been acquitted.
 
 
 52
 Brady v. Maryland held that the prosecution may not suppress evidence favorable to an accused where the defendant moves for its production and the evidence is material to either guilt or punishment. 373 U.S. 83, 87 (1963). This rule "applies to impeachment evidence as well as to exculpatory evidence." United States v. Ashley, 54 F.3d 311, 313 (7th Cir.), cert. denied, 116 S.Ct. 232 (1995) (citing United States v. Bagley, 473 U.S. 667, 676 (1985)).[8] This is so because impeachment evidence is "evidence favorable to an accused [because] if disclosed and used effectively, it may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676. A Brady violation only requires reversal of a conviction "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Id. at 678; see also, Ashley, 54 F.3d at 313 (citing Bagley, 473 U.S. at 682) ("evidence withheld by the government is material only if there is a reasonable probability that its disclosure to the defense would have changed the result of the proceeding."); Jones v. Washington, 15 F.3d 671, 676 (7th Cir.), cert. denied, 114 S.Ct. 2753 (1994).
 
 
 53
 In its appellate brief, the government concedes that: [w]ithout question, the disclosure [of the interrogatories] should have occurred as soon as the decision was made on August 24, 1994, to have Smith be a witness in the trial. That is so, because there is no dispute whatsoever that the interrogatory answers made by Smith were valuable material for impeachment by Gonzalez. Recognizing that, the United States made the document available to counsel as soon as the oversight was discovered.
 
 
 54
 The prosecution maintains however that the oversight and untimely disclosure of the interrogatories was cured because Gonzalez's counsel received the documents and was able to confront Smith with their existence on the stand.
 
 
 55
 At the time Gonzalez's counsel received the interrogatories, at the completion of his cross-examination, instead of requesting a recess or continuation so that he might study the answers and prepare his next examination, he proceeded directly to re-cross examine Smith, using Smith's answers to the interrogatories. He asked if Smith answered the questions under the penalty of perjury, and after Smith responded that he had, defense counsel elicited that Smith had fabricated his source for the money, and had answered falsely concerning his criminal history record, his reason for being at the hotel on March 10 and 11, and his knowledge of Gonzalez's involvement in the drug trade. Only after Gonzalez's attorney made an attempt to ensure that the jury was aware of each and every one of Smith's falsehoods on the interrogatories, the defendant's attorney concluded his examination.
 
 
 56
 Because the defendant failed to request extra time to examine and review the interrogatories before proceeding with cross-examination, we can only assume that at the time he and his counsel were apparently satisfied that his re-cross examination was sufficiently effective in its impeachment of the witness Smith. Now, after trial, Gonzalez attempts for the first time to persuade us that had his attorney been able to impeach Smith with his answers in his initial cross-examination, it would have been vastly more effective, to the extent that Gonzalez might have been acquitted.
 
 
 57
 In United States v. Nelson, 39 F.3d 705, 708 (7th Cir.1994), we held that once a witness's motive to lie is exposed on cross-examination, "it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." The same reasoning applies to impeachment: once Gonzalez's attorney had the opportunity and did in fact thoroughly expose Smith's perjury on the interrogatories, the defendant's Sixth Amendment right to confront and cross-examine the witnesses against him was satisfied. The fact that Gonzalez now speculates his attorney's cross-examination might have been more artful or forceful had he been provided with the interrogatories sooner, is a fact of "peripheral concern" to the exercise of Gonzalez's right, and does not require the reversal of his conviction on appeal. We wish to make clear that we do not countenance the government's carelessness in failing to deliver the impeachment evidence to the defendant. We restate that the government is expected to follow each and every mandate of the law to the highest standard. See United States v. Xheca, 704 F.2d 974, 981 (7th Cir.1983); United States v. Krebs, 788 F.2d 1166, 1176 (6th Cir.1986) ("United States Attorneys are held to a higher standard of behavior than other attorneys."). However, the government's oversight was cured because Gonzalez had the opportunity and did in fact confront the witness Smith with his perjury; thus we hold that Gonzalez suffered no impairment of his right to effectively confront the witnesses against him.
 
 D. RELEVANT CONDUCT
 
 58
 Gonzalez's final argument is that the district court committed clear error when it determined that he was responsible for the transfer of 1,986 pounds (900.8 kilograms) of marijuana between the period of October 1991 and February 1993. His claim is two-fold: (1) the drug transactions from October 1991 until February 1993 were not part of the same course or conduct as the offense with which he was charged, but rather, constituted a separate conspiracy; and (2) the information concerning his drug dealings received from Jerry Parker and his son Greg is unreliable because the two men were providing the information in exchange for immunity from prosecution.
 
 
 59
 In establishing factors that determine the base offense level, the government is only required to prove such factors by a preponderance of the evidence. The standard of review in such cases is a deferential one. This court has consistently held that factual determinations in the sentencing context will be reversed only for "clear error." A finding of fact is clearly erroneous and will be disturbed by this court only if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been committed."
 
 
 60
 United States v. Garcia, 66 F.3d 851, 856 (7th Cir.1995) (quotations omitted). "On numerous occasions, we have held that the clearly erroneous standard applies to estimates of drug quantities made for sentencing purposes because the district court, as the trier of fact, not only has the authority but is in the best position to determine the amount of narcotics attributable to the [defendant]." Id. (quotation and citations omitted, alteration in original).
 
 
 61
 Under § 1B1.2 of the Sentencing Guidelines, the district court is required to consider "relevant conduct" in calculating a base offense level. "Relevant conduct" includes "all ... acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Thus, "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable Guidelines sentencing range." Id. at cmt. 10 (background);[9] see also United States v. Stephenson, 53 F.3d 836, 849 (7th Cir.1995) ("In determining the amount of drugs attributable to each defendant, the court may consider relevant conduct which was part of the charged offense but was not included in the indictment"). "[I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or common scheme or plan as the count of conviction." U.S.S.G. § 1B1.3, ct. 10. "Section 1B1.3(a)(2) thus is designed to take account of a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." United States v. Sykes, 7 F.3d 1331, 1335 (7th Cir.1993) (quotation and citations omitted).
 
 
 62
 Whether Gonzalez's earlier transactions were part of the "same course of conduct" as the offense of conviction (conspiracy to distribute marijuana) "depends upon the similarity, regularity and temporal proximity of the incidents in question." United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir.1993) (citations omitted).
 
 
 63
 In considering the similarity of the conduct in question, a court must look to the identity of the participants and their roles in the events in issue, as well as the nature, structure and location of the allegedly related transactions, to determine whether the transactions are sufficiently related for the purposes of § 1B1.3(a)(2).
 
 
 64
 Id. (citations omitted). We have cautioned that in the context of U.S.S.G. § 1B1.3(a)(2), "a court must consider whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." Sykes, 7 F.3d at 1336 (citation omitted).
 
 
 65
 The record reflects that from October 1991, Gonzalez consistently supplied marijuana to Jerry and Greg Parker, except that during the period of October 1991 to March 1993 a middle-man (an individual named Barry Zimmerman) was used in the scheme. Furthermore, the roles of Gonzalez and Parker did not change throughout all the entire time period: Gonzalez supplied the drugs on credit, a courier conveyed them to the Parkers, and the Parkers sold them to their customers, thereafter returning the proceeds to the defendant. The transactions occurred regularly, almost every month, and they all took place within the seventeen months immediately preceding the charged conspiracy. Thus, all of the conditions of Cedano-Rojas have been satisfied (similarity, regularity, and temporal proximity), and we are of the opinion that the uncharged conduct between October 1991 and January 1993 was all part of the "same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).
 
 
 66
 Gonzalez points out that during the trial, when the attorneys were arguing the 404(b) issue before the trial judge, the judge stated that the time from October 1991 until February 1993 was a "separate conspiracy." The defendant overlooks the fact that in spite of the judge's off-the-cuff remarks during the discussion, he eventually reversed his thinking after reviewing further and more complete evidence and ruled that the evidence proffered by Rose and Parker was admissible because it constituted part of the same course of conduct as the charged offense. Thus, although the relevant conduct was not officially charged as part of the conspiracy in the indictment, the district court consistently, and correctly, considered it part of the same plan and scheme as the conduct charged in the indictment.
 
 
 67
 Our inquiry is not at an end, however, for Gonzalez also challenges the reliability of the information the Parkers provided about his involvement in the drug deals because each man provided it in exchange for a grant of immunity for their involvement in the drug deals. Thus, argues the defendant, they had a strong motive to fabricate information in order to deflect guilt from themselves and escape or reduce their respective periods of confinement.
 
 
 68
 "[A] criminal defendant has a due process right to be sentenced on the basis of reliable information." United States v. Beler, 20 F.3d 1428, 1432 (7th Cir.1994) (quotation and citations omitted). It is for this reason that U.S.S.G. § 6A1.3(a) authorizes a court "to consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."
 
 
 69
 We note that the district court observed Jerry Parker testify at trial, and had the opportunity to assess his credibility. "Any argument that the trial judge should have disbelieved a certain witness is doomed at the outset." United States v. Porter, 23 F.3d 1274, 1278 (7th Cir.1994) (quotation omitted). The judge gave credence to Parker's testimony concerning the regularity with which he received marijuana shipments from Gonzalez and the amount of drugs in each load. We refuse to second-guess his determination for he had:
 
 
 70
 the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture, and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.
 
 
 71
 United States v. Eddy, 8 F.3d 577, 582-83 (7th Cir.1993), cert. denied, 115 S.Ct. (1994).
 
 
 72
 Furthermore, "the Federal Rules of Evidence are inapplicable at a sentencing hearing, and the court is thus free to consider a wide range of information, including hearsay evidence, that may have been inadmissible at the defendant's trial." United States v. Beler, 20 F.3d 1428, 1432 (7th Cir.1994) (citations omitted). Thus, although Greg Parker's information was relayed through the testimony of Agent Hinkle, such hearsay evidence is admissible at a sentencing hearing, as long as it has "sufficient indicia of reliability." All of the relevant details Agent Hinkle recited, as were told to him by Greg Parker, were substantially corroborated by Jerry Parker's trial testimony: the Parkers received monthly shipments of marijuana from Gonzalez, through Zimmerman between October 1991 and February 1993.
 
 
 73
 It is true that there were minor discrepancies between Greg Parker's information, as reported by Hinkle, and Jerry Parker's testimony; Greg Parker estimated that he and his father received fourteen shipments of marijuana which ranged in weight from 150 to 400 pounds, whereas Jerry Parker testified that he and Greg received seventeen loads of drugs, weighing approximately 125 to 180 pounds each. In order to account for the discrepancies, and to give the defendant the benefit of the doubt concerning his relevant conduct, the sentencing judge based his calculations on the lowest estimates from each man and attributed fourteen 125 pound loads of marijuana to Gonzalez plus the 236 pounds which Greg Parker abandoned in Prescott, Arizona (1,986 pounds total). The preponderance of the evidence, supports the district judge's conclusion that Gonzalez was responsible for the transportation and sale of these 1,986 pounds of marijuana in the fourteen month period prior to the charged conspiracy, and we affirm his conservative calculations of Gonzalez's relevant conduct.
 
 
 74
 AFFIRMED.
 
 
 
 [1]
 The United States government agreed not to use any statement or written document provided by Parker in a criminal prosecution against him, provided he was complete and truthful in his testimony. See 18 U.S.C. § 6003
 
 
 [2]
 Smith, the co-defendant of Gonzalez, entered into a plea agreement the morning the trial began and entered a plea of guilty to counts one and two of the superseding indictment (conspiring to distribute marijuana and conducting a financial transaction with $80,000 of drug proceeds), while count three was dismissed. In exchange for the dismissal and the government's agreement to file a U.S.S.G. § 5K1.1 motion (downward departure for substantial assistance to authorities), Smith testified against Gonzalez at trial
 
 
 [3]
 Gonzalez objected to any of Parker's testimony concerning the events prior to charged conspiracy as evidence of prior bad acts, excludable under Federal Rule of Evidence 404(b); the trial judge ruled that the evidence was related to Gonzalez's specific intent to distribute marijuana. Gonzalez renews his contention on appeal and we will address the issue in the opinion
 
 
 [4]
 At the time of trial, Rose was serving a fifteen year sentence as a result of a 1991 conviction for conspiracy to possess with intent to distribute marijuana. As part of a plea agreement in that case, he agreed to testify against Gonzalez
 
 
 [5]
 At the time of Gonzalez's trial, Justus was serving a sentence for this crime. He testified against the defendant pursuant to a grant of immunity
 
 
 [6]
 The district court originally set the trial date August 29 but sua sponte rescheduled the trial for August 22
 
 
 [7]
 A defendant's initial appearance before a judicial officer is a "proceeding concerning the defendant" within the meaning of 18 U.S.C. § 3161(h)(1), and is excludable delay. United States v. Wright, 990 F.2d 147, 148 (4th Cir.), cert. denied, 114 S.Ct. 199 (1993)
 
 
 [8]
 The Jencks Act, 18 U.S.C. § 3500(b), and Fed.R.Crim.P. 26.2(a), provide that after a witness called by the United States completes his direct testimony, the court, on motion by the defendant, shall order the government to produce to the defendant, any statement made by the witness which relates to his testimony, for use in the defendant's examination of the witness. Smith's answers to the interrogatories relate to his testimony because they contradict his assertion at trial that Gonzalez was involved in drug trafficking. The prior statements, therefore, tend to impeach the credibility of Smith's trial testimony. Jencks Act violations are subject to harmless error analysis. See, e.g., United States v. Carr, 965 F.2d 408, 412 (7th Cir.1992)
 
 
 [9]
 Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 113 S.Ct. 1913, 1915 (1993)